## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| **JANATHAEN STRUM** | ) |
| **Plaintiff** | ) **CIVIL ACTION** |
| | ) **FILE NO.** |
| **v.** | ) |
| **THE CONSOLIDATED** | ) |
| **GOVERNMENT OF COLUMBUS, GEORGIA,** | ) |
| **OFFICER SHANE ABREO, in his** | ) |
| **individual and official capacity,** | ) |
| **LIEUTENANT JEFFERY BRIDGES, in his** | ) |
| **individual and official capacity, and** | ) |
| **COLUMBUS POLICE DEPARTMENT** | ) |
| **CHIEF OF POLICE FREDDIE BLACKMON,** | ) |
| **in his individual and official capacity** | ) **Jury Trial** |
| | ) **Demanded** |
| **JOHN DOES 1-5,** | ) |
| **Defendants** | ) |
| _____ | ) |

## COMPLAINT FOR DAMAGES

COMES NOW, Janathaen Strum, Plaintiff herein, and hereby files this

Complaint for Damages against the above-named Defendants, respectfully alleging

as follows:

## Introduction

Plaintiff was needlessly shot in the back by Officer Shane Abreo of

Columbus Police Department on the night of May 29, 2022, despite being unarmed

with his empty hands in the air, as shown on Officer Abreo's body worn camera:





## Preliminary Statement

1.

This is a civil action pursuant to 42 U.S.C. § 1983 to redress deprivations under color of law depriving Janathaen Strum of his clearly established civil rights secured by the Fourth and Fourteenth Amendments to the United States Constitution arising from Officer Abreo's unreasonable and excessive use of deadly force against Plaintiff on May 29, 2022, in his capacity as a Columbus Police Department police officer.  Officer Abreo shot his service weapon into Plaintiff's car despite Plaintiff having his empty hands up and out the window.  Plaintiff was needlessly shot in the back causing serious injury.

Claims are hereby filed pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for civil rights violations, unreasonable use of force, substantive due process violations, *Monell* unconstitutional customs, policies, and or practices violations, and *Canton* for failure to supervise and discipline.  Plaintiff also raises pendant state law claims of battery, negligence, and violation of the Georgia Constitution. Plaintiff seeks compensatory damages, punitive damages, an award of costs, interest, and attorney's fees, and such other further relief as is available and this Court and the jury deem just and proper.

## Jurisdiction, Venue and Causes of Action

2.

This Court has original subject matter jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court also has jurisdiction pursuant to the provisions 42 U.S.C. 1983 and 42 U.S.C. § 1988, the Fourth and Fourteenth Amendment, and by the laws of the State of Georgia, pursuant to 28 U.S.C. § 1367(a), because the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

3.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and M.D.L.R. 3.4 because all incidents and or occurrences giving rise to this action occurred in this District, Plaintiff resides in this judicial District, some or all of the Defendants reside in this judicial district, and the events or omissions giving rise to these claims arose here in Columbus, Muscogee County, Georgia, which is situated within the District and Divisional boundaries of the Columbus Division of the Middle District of Georgia.

4.

Defendants violated the rights of Janathaen Strum under the United States Constitution and the laws of the State of Georgia when Officer Abreo unlawfully

and unnecessarily shot the unarmed Janathaen Strum in the back, while his hands were up.

5

Defendants' conduct under color of state law proximately caused the deprivation of Janathaen Strum's federally protected rights.  At all times mentioned in this Complaint, the Defendants acted jointly and in concert with each other   Each Defendant failed and refused to perform their duty, thereby proximately causing the injuries herein complained of.

6.

Jurisdiction supporting a claim for attorney fees and costs is conferred by 42 U.S.C. §§ 1983, 1988, and the 4th Amendment to the United States Constitution, and relevant Georgia law.

7.

This action has been brought within 2 years and all public entity notice provisions including O.C.G.A. § 36-11-1 have been met.

**The Parties**

8.

At all times relevant hereto Janathaen Strum was a citizen of the United States and resided in Muscogee County, Georgia.

9.

All of the Defendants receive some form of federal funding.

10.

Defendant Freddie Blackmon was and is at all times herein, the duly appointed Chief of Police of the City of Columbus Police Department which is a department of the Consolidated Government of Columbus, Georgia (the City) which is the governing entity of Columbus, Muscogee County, Georgia.  As Chief of Police, Defendant Freddie Blackmon (Chief Blackmon) is responsible for setting the policy that his officers are expected to follow and for making sure that said policy is followed.  Chief Blackmon is also responsible for the hiring, training, discipline and supervision of the employees of the Columbus Police Department. Sadi Defendant is holds office by virtue of the Constitution and laws of the State of Georgia, and was acting in the course and scope of his employment and under the color of law at all times relevant and is sued herein in his individual and official capacity for purposes of his actions and policies and training and supervision of law enforcement personnel under his control and supervision.  Chief Blackmon is the Policy Maker for Columbus, Georgia.  Said Defendant is subject to the jurisdiction of this Court and may be served with process by request for waiver of service by First Class mail sent care of James C. Clark, Jr., Page, Scrantom, Sprouse, Tucker & Ford, P.C., 1111 Bay Avenue, 3rd Floor, Columbus, Georgia,

31901, with a mailing address of P.O. Box 1199, Columbus, GA 31902-1199.

Otherwise, Chief Blackmon is a resident of and domiciled in Georgia, and may be

personally served at his residence or wherever he may be found.

11.

Lieutenant Jeffery Bridges is employed by the City of Columbus Police

Department, and was acting in the course and scope of his employment and under

the color of law at all times relevant, and is sued herein in his individual and

official capacity for purposes of his actions and inactions as described below.

Defendant Lieutenant Jeffery Bridges acted within the scope of his employment

which was governed by the policies and procedures of the Columbus Police

Department, a department of the Consolidated Government of Columbus, Georgia

(the City).  Lieutenant Jeffery Bridges is responsible for Internal Affairs

investigations, discipline, and supervision of the employees of the Columbus

Police Department.  Said Defendant was acting in the course and scope of his

employment and under the color of law at all times relevant and is sued herein in

his individual and official capacity for purposes of his actions and policies, and

internal affairs investigation of law enforcement personnel under his control and

supervision.  Said Defendant is subject to the jurisdiction of this Court and may be

served with process by request for waiver of service by First Class mail sent care

of James C. Clark, Jr., Page, Scrantom, Sprouse, Tucker & Ford, P.C., 1111 Bay

Avenue, 3rd Floor, Columbus, Georgia, 31901, with a mailing address of P.O. Box 1199, Columbus, GA 31902-1199.  Otherwise, Lieutenant Jeffery Bridges is a resident of and domiciled in Georgia, and may be personally served at his residence or wherever he may be found.

12.

Officer Shane Abreo is employed by the City of Columbus Police Department, and was acting in the course and scope of his employment and under the color of law at all times relevant, and is sued herein in his individual and official capacity for purposes of his actions and inactions as described below. Defendant Officer Shane Abreo, was, at all times relevant herein, a Columbus, Georgia, police officer employed by the Columbus Police Department and acting in that capacity at all times relevant herein.  Officer Abreo acted within the scope of his employment which was governed by the policies and procedures of the Columbus Police Department, a department of the Consolidated Government of Columbus, Georgia (the City).  Said Defendant is subject to the jurisdiction of this Court and may be served with process by request for waiver of service by First Class mail sent care of James C. Clark, Jr., Page, Scrantom, Sprouse, Tucker & Ford, P.C., 1111 Bay Avenue, 3rd Floor, Columbus, Georgia, 31901, with a mailing address of P.O. Box 1199, Columbus, GA 31902-1199.  Otherwise,

Officer Abreo is a resident of and domiciled in Alabama, and may be personally served at his residence or wherever he may be found.

13.

The Consolidated Government of Columbus, Georgia (the City), also known as the Columbus Consolidated Government, is and was at all times relevant herein the duly organized governing entity of Columbus, Muscogee County, Georgia, created and existing by virtue of the laws of the State of Georgia, an entity subject to suit, and subject to the jurisdiction of this Court. The City is liable for constitutional deprivations pursuant to governmental custom, policy, or practice whether written or unwritten. See *Monell v. New York Dept. of Social Services*, 436 U.S. 658 (1978).

The City's policies, practices, and customs, through its police department, were a moving force in the constitutional violations described in this Complaint. Said Defendant is subject to the jurisdiction of this Court and may be served with process by request for waiver of service by First Class Mail sent care of James C. Clark, Jr., Page, Scrantom, Sprouse, Tucker & Ford, P.C., 1111 Bay Avenue, 3rd Floor, Columbus, Georgia, 31901, with a mailing address of P.O. Box 1199, Columbus, GA 31902-1199.

## Facts

14.

After midnight on May 29, 2022, Officer Shane Abreo used unreasonable and unnecessary deadly force against Janathaen Strum.

15.

As shown by Officer Abreo's body worn camera recordings ("bodycam"), when Officer Abreo used deadly force against Mr. Strum, Mr. Strum's hands were up, Mr. Strum was unarmed, and Mr. Strum posed no threat to the safety of the officer or anyone else. [1]

16.

At 1:36:13 am, Officer Abreo was on patrol duty on Wellborn Drive responding to a domestic situation when he heard gunshots fired approximately two (2) miles away.

17.

At 1:36:50 am according to Officer Abreo's bodycam, Officer Abreo was in his patrol vehicle and started driving toward the location of the gunshots, which Officer Abreo learned from dispatch was on Urban Avenue.

---

[1] Officer Abreo's body worn camera footage "bodycam" is hereby incorporated by reference, as if fully pleaded herein, and can be viewed at the following link: https://www.dropbox.com/s/cjdks5mnxv0yalb/Strum.BC22015243_379_05292205 4114_27%20-%20Trim.mp4?dl=0

18.

At the time of Officer Abreo's departure from Wellborn Drive, there had

been approximately 25 to 50 shots fired, and the firing was no longer ongoing.  All

gunshots had fully ceased when Officer Abreo proceeded from Wellborn Drive.

19.

Officer Abreo departed from Wellborn Drive at 1:36:50 am, traveling speeds

up to and including 80 mph, and arrived to the area of Urban Drive near the

intersection of Norton Street at 1:39:55 am.

A google map shows the distance from Wellborn Drive to Urban Drive:



20.

At 1:39:07 am Dispatch asked Officer Abreo "are they still firing?"

Officer Abreo responded:  "Negative.  People are leaving at a fast pace".

Dispatch replied:  "Let them leave.  Try to get them out of there as soon as

possible.  Let them leave".

21.

Officer Abreo does not direct traffic or try to get individuals at the scene to

leave as instructed by Dispatch.  Officer Abreo asks individuals at the scene

"Where they at?  who shot?"

22.

At 1:39:59 am Officer Abreo radios to Dispatch that he is on scene at the

intersection of Urban and Norton.  Officer Abreo exits his patrol car and begins

walking.

23.

At 1:40:02 Dispatch informs Officer Abreo "10-4 when everything calms

down, we do have a complainant at 2912 her window was hit…"

24.

Officer Abreo walks up Urban Avenue on foot, and at 1:40:05 am asks

individuals standing by their cars and walking "is anybody hurt?"  Officer Areo is

told no, but cars have been impacted.  Officer Abreo again asks "who shot?"  One

individual responds "the bullet went through her car door. we don't know who shot

though".

25.

At 1:40:18 according to Officer Abreo's bodycam, Officer Abreo radios "So far nobody hurt.  I need ID out here though, there's multiple cars hit."

26.

At 1:40:28 according to Officer Abreo's bodycam, Officer Abreo asks "Is anybody hit?"  One individual responds "no".

27.

At 1:40:35 according to Officer Abreo's bodycam, Officer Abreo states "If you are hit, if you've been shot, let me know."

28.

Officer Abreo's bodycam shows no further interactions with individuals at the scene, nor is any heard.

29.

At 1:40:36 according to Officer Abreo's bodycam, Officer Abreo walks towards the rear of a black BMW sedan that is stopped waiting in traffic.

30.

Officer Abreo approaches the black BMW on the right side.

31.

The black BMW is behind an SUV that is also stopped.  To the right of the black BMW is a blue sedan facing opposite Officer Abreo with its lights

illuminated.  There is another car on the left side of the road facing opposite to Officer Abreo.

32.

In addition, a white car can be seen turning perpendicular into a drive-way in front of the SUV that is in front of the black BMW, blocking traffic.  Three lanes of traffic have formed on the roadway, with two lanes facing headlights toward Officer Abreo- and one lane in the center of the street, rear-facing to Officer Abreo, heading in the same direction of travel that Officer Abreo is walking.

33.

Bodycam shows the following at this time, the black BMW is on the left:



34.

At 1:40:38 Officer Abreo approaches the right passenger side of a black

BMW from the rear and yells at the driver of the black BMW:

"Alright hey!  You!  Get down!  Get down!  Get out the car!"

Officer Abreo has already brandished his police firearm and is pointing it

into the black BMW with his right hand.

35.

Bodycam shows the following at this time:



36.

At 1:40:43 according to Officer Abreo's bodycam, Officer Abreo has

already brandished his police firearm and is pointing it into the black BMW with

his right hand.  Officer Abreo's left hand is pointing a flashlight at the driver.

37.

The driver of the black BMW is Plaintiff Janathaen Strum.  Mr. Strum has

nothing in his hands and fears for his life.  Mr. Strum attempts to comply with the

confusing poorly-worded directions, and fears he will be shot.

Bodycam shows the following at this time:



38.

At 1:40:45 according to Officer Abreo's bodycam, Officer Abreo has moved

around to the back of the black BMW.

39.

At 1:40:48 according to Officer Abreo's bodycam, Officer Abreo has come

around to the driver's side of the black BMW and yells at the driver of the black

BMW "get out the car".

40.

Bodycam shows the following at this time:



41.

At 1:40:50 according to Officer Abreo's body cam, the driver of the black

BMW has his hands outside the window of his car:



42.

At 1:40:51 according to Officer Abreo's bodycam, Officer Abreo yells at the driver of the black BMW "get out the car" while Mr. Strum's hands remain empty, raised, and outside the car window.





43.

Fractions of a second later according to Officer Abreo's bodycam, Officer

Abreo fires his firearm into the black BMW. [2]  The driver, Janathean Strum, is shot

in his back.  The vehicle is not in 'park' and the bullet's impact involuntarily

forces Mr. Strum to lurch forward causing him to accelerate the vehicle into a

head-on-collision with another car, driven by an individual named Mr. Mike Johns.

Mr. Johns required emergency medical attention.

---

[2]  Columbus Police Department General Order Section 3-4.1 provides:

DISCHARGING OF FIREARMS PROHIBITED
☐ To effect the arrest of a person who has committed a crime less than a felony
☐ Spontaneously into or near a crowd
☐ When an innocent person may be hit
☐ At or from a moving vehicle unless the suspect represents a clear and direct threat to the life and/or safety of the officer or other innocent persons, and then only as a last resort.

44.

The driver of the black BMW, Janathaen Strum, Plaintiff herein, is shot in the back, approximately halfway between his left shoulder and spinal cord.

45.

At 1:40:55 according to Officer Abreo's bodycam, Officer Abreo radios "I got shots fired".

46.

At 1:41:04 according to Officer Abreo's bodycam, Officer Abreo yells at the driver of the black BMW, which is now crashed into another car, "get out the car". Mr. Strum is next seen on the grass with Officer Abreo's flashlight pointed at him. Mr. Strum runs a short distance but goes to the ground within 3 seconds.

47.

Officer Abreo points his firearm at Strum and yells "why you running?"

48.

Mr. Strum responds "because you shot me for no reason".

49.

Officer Abreo claims "I saw you with a gun".  Officer Abreo then begins handcuffing Strum.  A bystander named Fred pleads with Officer Abreo not to handcuff Mr. Strum so that Mr. Strum will not according to the bystander Fred, "bleed out".  Fred then administers first aid pressure to Mr. Strum's back.

50.

Officer Abreo leaves the wounded Mr. Strum to look inside Mr. Strum's black BMW.  Officer Abreo does not find anything and returns to Mr. Strum who is on the ground, profusely bleeding while the bystander Fred applies pressure.

51.

Officer Abreo leaves again to look inside Strum's black BMW.  Finding nothing, Officer Abreo returns to Mr. Strum and asks "where'd you toss the gun?" Mr. Strum, who is now lying on his stomach, responds "I didn't have a gun."

52.

Officer Abreo returns to Mr. Strum's black BMW a third time and looks inside.  Again not finding a weapon, Officer Abreo tells his colleague "I got it all on body cam.  Somebody else drove by this car".

53.

Officer Abreo later claimed to Georgia Bureau of Investigation "GBI" investigators that he saw the driver of the black BMW with a firearm in his right hand.

55.

Officer Abreo also later claimed to GBI he saw the firearm so clearly and remembers it so specifically because he was an "armorer in the military" and "worked a lot was Sigs and [ ] could tell what kind of gun it was. It was either a

Sig Sauer P220 or a P226 [with] distinct ridges in the back of the slide… a
pronounced dovetail on it or a beaver tail, and those are on the back of the slide,
the handle has a really big beaver tail… and a Sig has very distinct serrations on
the back of the slide…and you could tell by the front barrel there was like carbon
buildup from when it has been fired a bunch [and Officer Abreo] could see the
whole length of the firearm from the barrel to the slide because the middle center
console isn't that high on the BMW and he had it in his right hand at this point"
[while Officer Abreo was on the passenger side on the open window].

56.

Comparing Officer Abreo's bodycam video with Officer Abreo's statements
to GBI shows Officer Abreo's statements to GBI are clearly false.

57.

Officer Abreo also later claimed to the GBI investigators that the driver of
the black BMW attempted to "crush" him with his car.  Officer Abreo claimed the
driver of the black BMW steered right into the parked cars while Officer Abreo
was on the right passenger side.

58.

Officer Abreo also later claimed to GBI investigators that the driver of the
black BMW attempted to "pin [Officer Abreo] between two cars" with his vehicle.

59.

Officer Abreo also later claimed to GBI investigators that the driver of the black BMW was going to hit pedestrians and "push people out of the way" with his vehicle.

60.

Officer Abreo later claimed to GBI investigators he was justified in shooting Mr. Strum due to the driver's "recklessness".  Officer Abreo claimed to GBI that the driver of the black BMW was "straight up disregarding anything around him" and because Officer Abreo "previously saw the firearm, [ ] that's when I made my decision that he's being so reckless that I'm going to discharge my firearm. At that point, he had already shown that he has no regard for anyone around him.  He's just gonna run over whoever's in front of him".

61.

Comparing Officer Abreo's bodycam video with Officer Abreo's statements to GBI investigators shows Officer Abreo's statements are clearly false.

62.

Mr. Strum was not "reckless" nor was Mr. Strum steering the black BMW in an attempt to "crush" Officer Abreo.  Mr. Strum's hands were not even on the steering wheel nor was there any "pinning" or "crushing" of Officer Abreo on his right side as shown by Officer Abreo's own bodycam:

 

 

63.

In addition, there were no pedestrians or people in the roadway to "push".

Mr. Strum was obeying the rules of the road and was not following too closely

such that his vehicle touched or even came close to any other vehicle.

64.

Mr. Strum did not have a weapon, raised his empty hands, and was not a

threat, clear or direct, to the life and/or safety of the officer or any other person.

65.

Officer Abreo admitted to GBI investigators that he recognized Plaintiff as Janathaen Strum.  Officer Abreo even admitted to GBI investigators he knew how to spell Plaintiff's unusually spelled first name which Officer Abreo admitted has "a bunch of A's in there" and that "even when other officers got there and were trying to say his name they were saying Jonathan but I was telling him no it's not Jonathan. You spell it like this."

66.

Officer Abreo admitted he knew Plaintiff's identity and could also identify Plaintiff's identity with Plaintiff's license plates.

67.

Officer Abreo had many options if he was inclined to interrogate or apprehend Mr. Strum.

68.

Shooting into Mr. Strum's vehicle and shooting Mr. Strum in the back was not what Columbus Police Department General Order Section 3-4.1 considers a "last resort".  See footnote 2, *supra*.

69.

There was no reasonable justification for Officer Abreo to shoot Mr. Strum.

70.

Officer Abreo's objectively unreasonable shooting of Mr. Strum also predictably and foreseeably caused a vehicular collision with an oncoming vehicle.

71.

Officer Abreo acted recklessly and used excessive force in shooting an unarmed, non-dangerous driver whose hands were raised in the air and out the window.  Officer Abreo then created a conspiracy and pretended others had hidden a non-existent weapon.  Officer Abreo followed up his phony story about a conspiracy to hide a weapon by fabricating a fantasy Sig Sauer weapon, both falsehoods which are clearly disproven by demonstrable video proof.

72.

The City of Columbus Police Department, Lieutenant Bridges, Chief of Police Freddie Blackmon and supervisor John Does 1-5 accepted these verifiably false untruths and exonerated Officer Abreo for his excessive use of force.  Officer Abreo, Chief of Police Blackmon, Lieutenant Bridges, the City of Columbus Police Department and John Does 1-5 participated in misrepresenting the circumstances and then found no fault, did not discipline, and exonerated Officer Abreo of any wrongdoing in the incident that resulted in the unlawful shooting of Janathaen Strum.  This is not the first time Defendants have engaged in such activities; in fact Defendants engage in such activities as a pattern and practice.

## CLAIMS FOR LIABILITY

### Federal Law Claims

### Count I – General 42 U.S.C. 1983 Claims – against all Defendants

73.

In doing the acts or omissions complained of above, Defendants acted under the color of law to deprive Plaintiff of certain constitutionally protected rights, including, but not limited to:

- The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution;

- The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution;

- The right to be free from the use of excessive force by state / city officers and actors, which is guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

- The right to be free from deprivation of liberty and injury without substantive due process.

- The right to be free from unlawful, reckless, deliberately indifferent, and conscience-shocking deadly and/or excessive force under the United States Constitution and its Amendments.

- The officer's actions here in shooting an unarmed person with whose hands were raised in the back and then creating phony stories to justify the shooting is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."… and… "can properly be characterized as . . . conscience shocking, in a constitutional sense."

74.

As a proximate result of the callous and or reckless actions and omissions described above, Janathaen Strum was injured and endured physical pain and mental suffering, and other damages.

## Count II - 42 U.S.C. 1983 - EXCESSIVE FORCE

75.

Under the circumstances described above, there was no need for force and therefore any use of force was excessive.  Officer Abreo utilized unnecessary excessive force.

76.

Where there is no need for force, any force used is constitutionally unreasonable.   There was no ***need*** for force here.

77.

Mr. Strum was one of many vehicles in the vicinity of a crime, but was not himself credibly suspected or accused of a crime.  Mr. Strum did not threaten the life or safety of any person, he was carefully and slowly proceeding away from danger, and complied with the officer's instructions, raising his hands to the window.

78.

Force decisions must reasonably consider the Officer's objective for using force; the Officer's reasonable perceptions of the subject's actions or behaviors the officer is attempting to stop, thwart, or control; the foreseeable risks of injuries or harm to the subject resulting from the force to be used and the foreseeable secondary risks of injury.

79.

The Officer did not give appropriate warnings nor was Mr. Strum capable of complying with demands to "get down" in his vehicle before Officer Abreo deployed an unreasonable and excessive amount of force.

80.

Considering Mr. Strum was unarmed, not a threat, was braking and or stopped and or slowly inching along with the very low speed of traffic and that neither Officer Abreo nor any pedestrian was ever in danger Eleventh Circuit law holds that where the plaintiff did not use or did not threaten to use his car as a weapon, an officer's use of deadly force by shooting into a vehicle is unreasonable.

81.

The callous and or reckless actions and omissions described above constitute violations of the rights secured to Strum by the Fourth Amendment to the United States Constitution.

82.

Defendants unlawfully and unreasonably seized Plaintiff by means of excessive physical force.

83.

Officer Abreo's actions violate Federal law as explained in *Morton v. Kirkwood,* 707 F. 3d 1276 - Court of Appeals, 11th Circuit 2013, in which the officer's use of deadly force violated the Fourth Amendment right to be free from excessive force.

**Count III - Violation of Fourth and Fourteenth Amendment,**
***Deliberate Indifference* to Substantial Risk of Injury**

84.

Plaintiff incorporates and realleges all allegations as if set forth fully verbatim

herein.

85.

Columbus Police Department General Order Section 3-4.1 provides:

DISCHARGING OF FIREARMS PROHIBITED
☐ To effect the arrest of a person who has committed a crime less than a felony
☐ Spontaneously into or near a crowd
☐ When an innocent person may be hit
☐ At or from a moving vehicle unless the suspect represents a clear and direct
threat to the life and/or safety of the officer or other innocent persons, and then
only as a last resort.

86.

Officer Abreo violated all four of these provisos in shooting the unarmed

driver of a vehicle whose hands were empty and out the window, who had

committed no crime and was not a threat to the life and/or safety of the officer or

other innocent persons, nor was shooting the driver who was in traffic with his hands

up a last resort.

87.

These policy violations also violate Federal law as explained in *Morton v.*

*Kirkwood,* 707 F. 3d 1276 - Court of Appeals, 11th Circuit 2013, in which the

Eleventh Circuit ruled if the officer shot an unarmed man in a vehicle while having

no reason to believe that the man would place anyone's safety in danger, the officer's use of deadly force violated the Fourth Amendment right to be free from excessive force.

88.

In *Morton*, *supra*, the plaintiff asserted that the officer violated the applicable Guntersville Police Department Policy Manual ("Policy Manual"). Sections of the Policy Manual bar officers from shooting at suspects, even if they are escaping.  For instance, the Policy Manual bars officers from shooting their guns "in an attempt to disable moving vehicles, unless subjects from the vehicle are firing at the officer." *Morton*, 707 F. 3d at 1285.

89.

This same policy has been accepted and promulgated as standard procedure by almost all police departments including, for example, the New York Police Department, Albuquerque, Boston Police Department, Chicago Police Department, Cincinnati Police Department, Denver Police Department, Houston Police Department, Las Vegas Metro Police, Los Angeles Police Department, Orlando Police Department, Miami Police Department, Detroit Police Department, Philadelphia Police Department, Washington, DC Metropolitan Police Department, Nassau County, NY Police, Syracuse Police, and New Orleans Police Department, among others.  The Department of Justice adopted the same policy.

90.

The United States Department of Justice and Federal Bureau of Investigation have forbidden shooting to disable a moving motor vehicle except in rare circumstances.  See Office of the Attorney Gen., October 17, 1995 Memorandum Resolution 14 (1995), which states:

> Motor vehicles and their occupants. Experience has demonstrated that the use of firearms to disable moving vehicles is either unsuccessful or results in an uncontrolled risk to the safety of officers or others. Shooting to disable a moving motor vehicle is forbidden.
>
> An officer who has reason to believe that a driver or occupant poses an imminent danger of death or serious physical injury to the officer or others may fire at the driver or an occupant **only** when such shots are necessary to avoid death or serious physical injury to the officer or another, and **only** if the public safety benefits of using such force reasonably appear to outweigh any risks to the officer or the public, such as from a crash, ricocheting bullets, or return fire from the subject or another person in the vehicle.
>
> Except in rare circumstances, the danger permitting the officer to use deadly force must be by means other than the vehicle.
>
> https://www.justice.gov/archives/ag/attorney-general-october-17-1995-memorandum-resolution-14-attachment-1

91.

According to Police Executive Research Forum ("PERF") and to the International Association of Chiefs of Police ("IACP"), acceptable policy includes that "Officers shall not discharge their firearms from a moving vehicle, or at a moving vehicle or its occupants, unless the occupants are using deadly physical force against the officer or another person present, by means other than the vehicle

itself." See PERF, Critical Issues in Policing Series, Guiding Principles on Use of Force, Principle #8, at pages 15, 16, 25, 26, 36, 44-45, 47, 50, 74, 76, 78, 118 at:

https://www.policeforum.org/assets/30%20guiding%20principles.pdf

92.

Likewise, IACP's National Consensus Policy On Use of Force issued in 2020 agrees, and declares, within its Procedures section on the Use of Deadly Force that "Firearms shall not be discharged at a moving vehicle unless (1) a person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle; or (2) the vehicle is operated in a manner deliberately intended to strike an officer or another person, and all other reasonable means of defense have been exhausted (or are not present or practical), which includes moving out of the path of the vehicle."

See IACP's National Consensus Policy On Use of Force, pages 4, 14, from:

https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf

93.

The City of Tallahassee Police Department ("TPD") contracted with PERF to provide a review and assessment of the TPD's policies and procedures in 2015. The TPD's use of force was unequivocally instructed to "include an absolute prohibition against shooting from a moving vehicle, or shooting at a moving vehicle when the vehicle itself is the only "weapon" being utilized by a suspect.

This is a national best practice which has been in place in the New York City Police Department since 1972."  See pages 9, 23, 30, 31, 75:

https://www.boarddocs.com/fla/talgov/Board.nsf/files/A2PH784704B1/$file/PERF%20-%20Tallahassee%20Final%20Report.pdf

94.

Since 2014, the Georgia Association of Chief of Police model policy has stated that firearms "should not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening an officer or another person with deadly force by means *other than the vehicle*.".  The Georgia Department of Public Safety has had the same prohibition since 2015.  See Policy #10.01 - Use of Force Page 7 of 9, 10.01.6 Deadly Force, subsection C: Prohibited Use of Firearms 1. Members shall not discharge their firearms under the following circumstances: a. When not in accordance with the provisions of this policy; b. As a warning shot; c. At a fleeing vehicle unless authorized by a Post Commander, or above, in an attempt to disable a vehicle during a pursuit. This shall not prohibit the use of firearms against occupants of a vehicle when the use of deadly force is authorized by law.

https://dps.georgia.gov/chapter-10-use-and-control-weapons

95.

Columbus Police Department General Order on Use of Force, Section 3-4.2 requires:

CONSIDERATION PRIOR TO SHOOTING

The discharge of a firearm is an irreversible action and if possible, prior to firing, an officer should evaluate the following:

☐ Other means of effecting the arrest.
☐ Age of suspect and offense committed.
☐ Direction in which the firearm is to be discharged.
☐ Is the suspect in plain view?  Extreme caution must be used at night.
☐ The danger of firing while running or jumping.
☐ The presence and location of other people.

96.

Officer Abreo failed to consider all six of these provisos.

97.

Officer Abreo's conscience-shocking conduct and deliberate indifference to the safety of Plaintiff by intentionally shooting an unarmed person with his hands up constituted a deliberate indifference to the safety, security, and rights of Plaintiff and exposed Plaintiff to unreasonable risks of harm.

98.

Officer Abreo had the opportunity to identify Plaintiff's identity by the license plates on Plaintiff's vehicle and by Plaintiff's appearance.  In fact, Officer Abreo admitted to GBI investigators that Plaintiff's identity was well established before Officer Abreo shot Plaintiff in the back.

99.

As of the date of this police shooting, a reasonable police officer would have known that it was unlawful to shoot an unarmed motorist whose hands were raised

when the identity of the suspect was well established.  To do so is objectively

unreasonable and violates the Fourth and Fourteenth Amendments.

100.

Shooting Plaintiff in the back was unreasonable and disproportionate to any

alleged offense or threat that Plaintiff posed, and therefore, it was an unreasonable

seizure of Plaintiff's person and violation of Plaintiff's right to substantive due

process in violation of Plaintiff's Fourth and Fourteenth Amendments to the United

States Constitution to shoot Plaintiff in the back.

101.

As a direct and proximate result of the aforementioned acts of Officer

Abreo, recklessness of Officer Abreo, wrongful acts, indifference, and failures,

Plaintiff was deprived of his rights under the Constitution, shot, and suffered

serious injuries.


**Count IV – Supervisory Municipal Liability under *Monell* arising from Chief
Blackmon, Lieutenant Bridges, and the City's Deliberate Indifference and
Failure to Discipline Excessive Force and Misrepresentations of Facts**

102.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim

herein.

103.

Defendants have a duty to provide responsible and effective operations of its Police Department.

104.

Defendants have a duty to establish proper policies, customs, and regulations of the Department with regard to conducting fair and impartial investigations into the use of force involved in every incident in which force is used by officers.

105.

Before Plaintiff was shot Defendants had a custom and policy of failing to properly supervise and discipline officers in order to eliminate the potential of unjustified and deadly force.

106.

Failing to discipline officers encourages officers to use excessive force and accepting deception ratifies dishonesty and encourages officers to lie and misrepresent.

107.

Officer Abreo was not disciplined despite fabricating multiple clearly false fictional narratives:  that Mr, Strum was armed; that Mr. Strum had accomplices that hid said non-existent weapon; that Mr. Strum operated his vehicle unsafely, all of which were untrue and verifiable from Officer Abreo's bodycam.

**Count V – Supervisory Municipal Liability under *Monell* arising from Chief Blackmon, Lieutenant Bridges, and the City's Deliberate Indifference and Failure to Conduct Impartial Investigations of Alleged Officer Misconduct and of Failing to Discipline Excessive Force and Policy Violations**

108.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

109.

Officer Abreo violated multiple sections of Columbus Police Department Policy, including Columbus Police Department General Order Section 3-4.1 which provides:

DISCHARGING OF FIREARMS PROHIBITED
☐ To effect the arrest of a person who has committed a crime less than a felony
☐ Spontaneously into or near a crowd
☐ When an innocent person may be hit
☐ At or from a moving vehicle unless the suspect represents a clear and direct threat to the life and/or safety of the officer or other innocent persons, and then only as a last resort.

110.

Officer Abreo violated all four of these provisos in shooting the unarmed driver of a vehicle whose hands were empty and out the window, who had committed no crime and was not a threat to the life and/or safety of the officer or other innocent persons, nor was shooting the driver who was in traffic with his hands up a last resort.  Officer Abreo identified Mr. Strum and had multiple options including utilizing his radio to note Mr. Strum's license plate number and

interrogate Mr. Strum at a later date. Furthermore multiple cars were nearby and one car was in front of Mr. Strum coming toward Mr. Strum and shooting Mr. Strum foreseeably caused a crash with that oncoming vehicle. In addition, there was a crowd gathering on the sidewalk and in the yards of the neighborhood and Officer Abreo's shooting at Mr. Strum very well could have caused ricochet to strike nearby pedestrians who were not in the roadway, but nearby.

111.

Columbus Police Department General Order on Use of Force, Section 3-4.2 requires:

> CONSIDERATION PRIOR TO SHOOTING
> The discharge of a firearm is an irreversible action and if possible, prior to firing, an officer should evaluate the following:
> ☐ Other means of effecting the arrest.
> ☐ Age of suspect and offense committed.
> ☐ Direction in which the firearm is to be discharged.
> ☐ Is the suspect in plain view? Extreme caution must be used at night.
> ☐ The danger of firing while running or jumping.
> ☐ The presence and location of other people.

112.

Officer Abreo failed to take into consideration all six of these provisos. Officer Abreo's failure to consider Section 3-4.2 required supervision and discipline. To date however Officer Abreo's supervisors have not disciplined him in any way for this excessive unreasonable use of deadly force.

113.

Officer Abreo's violation of the above policies was never disciplined and Officer Abreo's supervisors unjustly exonerated Officer Abreo's actions finding this unreasonable shooting was justified.

114.

Defendants' failure to supervise and discipline Officer Abreo's actions for the unreasonable and unnecessary shooting of Mr. Strum is far from the first instance of Defendants' failure to discipline and supervise its officers.

115.

There are multiple examples of this failure to discipline and supervise.

116.

One example of Defendants' failure to supervise and discipline is an incident that occurred on October 18, 2019, in which Columbus Police Officer Clayton Watkins used unnecessary excessive force on an individual named Donnell Russell. Body camera footage showed Officer Watkins place Mr. Russell in handcuffs and subsequently punch Mr. Russell multiple times in his side, point a Taser at Mr. Russell, throw Mr. Russell to the ground and hit Mr. Russell again. Columbus Police Department supervisors refused to discipline and or supervise Officer Watkins.

117.

Another example is an incident occurred on November 6, 2016 in which Officer Allan H. Brown used unreasonable and excessive force in shooting into a vehicle in which Hannah Wuenschel was a passenger.  Officer Brown was never disciplined.

118.

Another example happening in 2017, when Columbus Police Department officers used excessive force on Hector Arreola, resulting in Mr. Arreola suffering cardiac arrest and brain damage caused by the force the officers used in restraining him.  Arreola said 13 to 16 times that he couldn't breathe as an officer sat on him for more than two minutes while Arreola was handcuffed.  The officers were never disciplined although the City of Columbus paid a settlement of $500,000 to the Arreola family.

119.

Another example happened in 2020, when Columbus Police Department officers removed Ms. Clara Virginia Britton, an elderly woman from her home, and injured Britton using force that caused Britton to later die of the injuries she sustained during the forcible removal.  The officers involved were never disciplined.

120.

The above instances are *examples* of Defendants' notice of prior instances of excessive force and failure to supervise and discipline officers.

121.

Chief Blackmon has been the city's police chief since November 2020.

122.

Chief Blackmon's leadership was questioned recently by both the Fraternal Order of Police (which gave Chief Blackmon a no confidence vote) and by a study performed by independent consultants Jensen Hughes, whose study of the Columbus Police Department resulted in 78 separate recommendations for improvement, and concluded that there are transparency and leadership issues within the Department.

123.

Complaints involving the misuse of force, abuse of authority, criminal misconduct, breach of civil rights and the discharge of a firearm are reported to the chief for a determination of who will investigate it.  Any discharge of a department firearm is investigated by the Office of Professional Standards (OPS).

124.

Order 2-6 requires all completed complaint reports and documentation to be forwarded to OPS to be recorded in a database and a file created.  However

according to the Jensen Hughes report, incoming citizen complaints are not recorded into a centralized database until after the involved bureau has investigated the complaint, the bureau commander has reviewed it, and it has been forwarded to the chief for review.  Most law enforcement agencies record and track complaints from the time they are initially received, a practice that gives greater visibility to OPS and department leadership, and which helps make sure complaints are tracked through a formal system and are completed in a timely manner.  According to Department Order 1-7.4, ultimately all discipline must have the approval of the chief, but Columbus Police Department's system allows complaints to go un-tracked and un-entered.

125.

Order 2-6.2 describes procedures for supervisors conducting complaint investigations.  The policy does not address the specific procedures for complaints assigned to OPS and specifically who in OPS conducts investigation.  An Internal Affairs best practice identified in the *COPS Law Enforcement Best Practices* guide is to designate explicitly who will investigate internal affairs complaints.  The Department does not separate the work of an investigator from the effort to make findings and recommendations.  OPS does not make recommendations regarding discipline.  Order 2-6.7 assigns the Department's OPS with five functions: Internal investigations; planning and research; staff inspections; accreditation;

criminal intelligence.  According to the Jensen Hughes study, the multiple

functions of the OPS presents conflicts of interest, impacts efficiencies negatively,

and blurs the OPS focus on maintaining the Department's integrity.  The Jensen

Hughes report also details that the Department does not have a written policy on

the selection process or length of tour for investigators assigned to OPS.  There are

several reasons why the length of assignment of internal affairs investigators

should be limited.  Too long in internal affairs creates investigators who are biased.

Such is the case with regard to Defendants named herein and their investigation of

Officer Abreo who Defendants exonerated despite clear evidence of policy

violations and unreasonable excessive force used on Mr. Strum.

126.

According to the Jensen-Hughes report, the deputy chief's direct

participation in OPS investigation by asking questions of the subjects during

interviews is "unusual" and as a result discipline decisions are "inconsistent".

127.

According to the Jensen Hughes report with regard to Use of Force reports,

training of investigators and supervisors as to Uses of Force is deficient

128.

Specifically, according to the Jensen Hughes report:

"Notably missing from this policy is any direction or guidance on the purpose and scope of the responsibilities of the supervisory staff in the review of these reports…To ensure all supervisors involved in the review of force incidents have a clear understanding of their roles and responsibilities, the CPD should consider developing a policy covering the review of the Department's Use of Force reports. The CPD should consider developing a separate training exclusive to the supervisors that covers the roles and expectations of a supervisor."

125.

The Jensen Hughes report also criticizes the lengthy period of time for the review process of a Use of Force incident, and recommends using technology to analyze Uses of Force -for example, the Department is not able to segregate Use of Force incidents involving arrested persons and those Force incidents that did not result in an arrest. Additionally, calculating Force incidents by race and gender requires a manual search, and the entire Use of Force review process, from completion of the filed Use of Force report by the officer through review by the chief, is paper-based. The Department also does not have an Early Intervention System.

129.

The Jensen Hughes report makes the following Accountability Recommendations:

*( Columbus, GA Police Department )*
**An Independent Assessment of the Columbus Police Department**

| Rec. # | Accountability Recommendation |
|--------|-------------------------------|
| 6.1 | Increase accessibility for community members to file a complaint or compliment a department member by creating a direct link on the department's website to submit a written complaint or compliment. |
| 6.2 | Amend the department's policy to ensure that complaints against department members are centrally recorded and tracked from the time the complaint is initially received until it is completed. |
| 6.3 | Transfer the Criminal Intelligence and Gang Analysis and Investigations functions from the Office of Professional Standards and have it organized as a stand-alone unit in the Bureau of Investigations. |
| 6.4 | Amend General Order 2-6 to outline specific processes and protocols for handling complaints assigned to the OPS, to include designating what staff positions in OPS will investigate complaints, identifying who supervises the investigations and providing clear standard operating procedures for conducting interviews. |
| 6.5 | Amend General Order 2-6 and consider limiting a complaint investigator's duties to identifying facts and evidence but not providing recommended findings, thus helping to ensure the investigation is handled in a thorough, fair and objective manner by having a follow-up reviewer perform that task. |
| 6.6 | Amend General Order 2-6 to require each person reviewing a Use of Force report to indicate whether they concur or disagree with the finding. Any time a reviewer disagrees with the finding, that person should document the reasons for disagreement. |
| 6.7 | Consider creating formally a use of force review board, which includes select members of the department from varying ranks as well as members of the department's training staff who are most suited to assess if a use of force is consistent with training and if adjustments to training are necessary. This board would assemble to review use of force cases where a finding of unjustified is rendered, or for cases involving any serious circumstances. The CPD should consider implementing this process and include the committee recommendation to the Chief of Police |
| 6.8 | Consider using a disciplinary matrix to promote fairness and consistency of corrective action when deciding disciplinary outcomes. |
| 6.9 | To stress CPD's goal to conduct independent, thorough, fair, and objective complaint investigations, and to reduce stress for officers as well as for those filing complaints, the Department should consider relocating OPS from its location adjacent to the Chief's Office to another location in the building or an off-site facility. |
| 6.10 | Consider limiting the time a department member is assigned as an investigator to the internal affairs investigations function. |
| 6.11 | Amend General Order 2-6 to require that OPS interviews be conducted by an official of equal or higher rank than that of the subject of the investigation. |
| 6.12 | Consider limiting the direct involvement of the Deputy Chief of the Office of Professional Standards in the actual front-end internal investigations, to include interviews. |
| 6.13 | The CPD should amend its early intervention system policy to trigger an early intervention alert after the indicator being tracked has occurred a set number of times within the specified period rather than waiting until allegations are sustained. The CPD should also consider tracking additional indicators such as traffic collisions and sick time usage |

130.

Officer Abreo's supervisors allowed Officer Abreo to fabricate fictional stories at odds with his bodycam and never held Officer Abreo responsible, supervised, or disciplined him.  Mr. Strum never had a weapon and held his empty hands up and out the window.  Officer Abreo contrived an imaginary Sig Sauer when video evidence shows there was none.  Officer Abreo created a false conspiracy that non-existent accomplices hid Mr. Strum's weapon when in fact no weapon nor accomplices existed.  Officer Abreo's supervisors allowed Officer Abreo to misrepresent the true facts despite video evidence from Officer Abreo's bodycam contradicting these false fabrications.

131.

Defendants were encouraged by supervisors to falsify official reports and paperwork and mislead GBI investigators as to the true nature of the circumstances.

132.

These failures to correct falsity but instead accept and defend misrepresentation and deception are failures to supervise and discipline and such ratify arbitrary and capricious leadership and enabled the unjustified uses of force in this incident.

133.

These failures to correct falsity but instead accept and defend misrepresentation are examples of ongoing widespread practice that. is so permanent and well settled as to constitute a custom or usage with the force of law. It also demonstrates that the Department explicitly authorized and or displays deliberate indifference towards constitutionally offensive actions of its employees in failing to discipline officers who use excessive force, falsify official reports and misrepresent facts to cover up wrongdoing.

134.

The Department's custom and practice of tolerating, encouraging, and condoning misconduct by officers directly and proximately resulted in Mr. Strum's injuries.

**Count VI – *Canton* Liability for Inadequate Training / Supervision / Discipline Violations of the Fourth Amendment**

**AND**

**Count VII Supervisory Liability Against Chief of Police Blackmon**

135.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

136.

Columbus Police Department either chose not to train officers on appropriate use of force, failed to modify, or inadequately trained and/or improperly supervised Officers on this issue.

137.

High ranking officials at Columbus Police Department knew and or reasonably should have known of repeated acts of excessive force.

138.

Columbus Police Department Officers receive very little, if any, training regarding when to use force, or appropriate responses.

139.

The violations of Mr. Strum's rights were proximately caused by, and pursuant to, the policies, customs, usages, and or longstanding patterns and practices of Columbus Police Department.

140.

These policies, customs, usages, patterns and practices of Columbus Police Department that caused the violations of Mr. Strum's rights include, but are not limited to failing to train, supervise, investigate, discipline, and adopt and enforce adequate policies concerning the Fourth Amendment's prohibition on the use of

excessive force and unreasonable seizure and/or condoning the use of excessive force.

141.

Chief Blackmon has final policymaking authority with respect to the matters enumerated above.

142.

The policies- be they express, implied, existent or non- show longstanding widespread practice, or other custom, usage, pattern, and or practice -of Columbus Police Department, and the actions of its state / city actors, caused the shooting of Plaintiff, and the damages alleged by the Plaintiff.

143.

Defendants failed to instruct, train, supervise and control defendant-actors with regard to use of force and proper discipline and supervision.

144.

The need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights and is the moving force of the constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

145.

Without limitation, these customs or policies included (1) having its officers use excessive force, and (2) failing to adequately discipline, train, or otherwise direct its officers concerning the proper standards for use of force.

146.

Columbus Police Department is charged with enacting and enforcing policies, procedures, protocols, and customs to ensure its officers are properly trained to carry out their duties. The Chief of Police failed in this regard by enacting policies, whether written or unwritten, that demonstrate deliberate indifference to Plaintiff, thereby causing the herein complained of harm suffered by Plaintiff, including one or more of the following failures:

a.  Not properly training officers on the use and dangers of excessive force;

b. Training and/or allowing officers to use excessive force on people who are simply being non-compliant even if the person poses no physical threat;

c. Encouraging officers to act improperly by failing to discipline those officers who fail to follow policy;

d. Training and/or encouraging and/or allowing officers to cover for each other instead of advising a supervisor of improper or unlawful conduct, thereby encouraging officers to act unlawfully and improperly; and

e. Having wholly inadequate disciplinary processes in place.

147.

Defendants thereby demonstrated deliberate indifference to Plaintiff's constitutional rights, as complained of herein, and the harm suffered is a direct result of this deliberate indifference and was foreseeable.

148.

All herein complained of actions of the Defendants were done recklessly, intentionally, maliciously, grossly negligently, wantonly, knowingly, and with deliberate indifference, and in a manner that shocks the conscience, and were objectively unreasonable.

## STATE LAW CLAIMS

### Count VIII. Negligence & Gross Negligence
### (Individual, Supervisory, Respondeat Superior)

149.

In the alternative, Plaintiff is are entitled to relief against Defendants for their negligence and or gross negligence in relation to the wrongful acts describe above.

150.

Columbus Police Department and the individual state / city actors owed Plaintiff a duty of care to behave in a safe and non-negligent fashion and use ordinary care in avoiding unnecessary physical harm and distress to persons

through their use of force.  Defendants breached these duties and breached their duties to carry out proper training, supervision, discipline, and retention of its officers.

151.

The conduct of the state / city actors was within the scope of behavior subject to respondeat superior under Georgia law.

152.

The negligent actions and conduct include but are not limited to failing to properly respond, improper Use of Force, failure to render medical aid, failing to properly supervise and retain state / city actors.

153.

The conduct of the state / city actors was extreme and outrageous.

154.

Defendants were negligent in hiring, supervising, condoning, and / or training and / or retaining state / city actors involved herein.

152.

These wrongful acts were the proximate cause of injuries further described above.

## Count IX. Common Law Assault & Battery
## (Individuals and Respondeat Superior)

153.

Plaintiff incorporates herein all previous allegations.

154.

Georgia law protects individuals from bodily invasions such as assault and battery. See O.G.C.A. § 51-1-13, § 51-1-14.

155.

Defendant intended to cause and did cause Plaintiff to suffer apprehension of immediate harm and severe injury as described above.

156.

Officer Abreo intentionally utilized his firearm as an extension of his body to inflict an offensive, unwanted and harmful touching onto Plaintiff.

157.

At no time did Plaintiff consent to the harmful and offensive touching and force from Defendant.

158.

Officer Abreo intended to make contact with Plaintiff.

159.

Throughout the encounter, Defendants acted willfully, with malice, in bad faith, without any lawful basis, and with intent to cause injury to Plaintiff.

160.

Plaintiff was seriously injured by Defendants.

161.

Defendants placed Plaintiff in immediate fear of death and severe bodily harm by battering him without any just provocation or cause.

162.

Defendants inflicted harmful and offensive, unprivileged and unconsented contact upon Plaintiff with the intent to cause such contact.

163.

The conduct of the Defendants, as described herein, intentionally caused an unauthorized harmful or offensive contact to Plaintiff's person.

164.

Columbus Police Department is liable as a principal for all torts committed by its employees within the course and scope of their employment, described herein, via respondeat superior.

165.

As a proximate result of the actions and omissions discussed in this count, Mr. Strum was injured, endured physical pain and mental suffering, experienced mental anguish and emotional distress.

## Count X. Intentional Infliction of Emotional Distress
### (Individual State / City Actors and Respondeat Superior)

166.

Plaintiff incorporates herein all previous allegations.

167.

The state / city actors created a medical emergency for Mr. Strum.

168.

Defendants, individually and in concert, engaged in outrageous conduct recklessly and or with the intent of causing Mr. Strum severe pain and emotional distress.

169.

Defendants' outrageous actions and or omissions were the actual and proximate cause of Mr. Strum's emotional distress.

170.

Defendants acted willfully and wantonly, inter alia, because, upon information and belief, they assumed that Mr. Strum was somehow morally deserving of rough treatment.

171.

These wrongful acts were the proximate cause of injuries further described above.

172.

Based on the willful, outrageous and malicious conduct of Defendants,
Plaintiff is entitled to punitive damages.

173.

A person is subject to liability to the other for physical harm resulting from
the failure to exercise reasonable care "when a person undertakes either
gratuitously or for consideration to render services to another, which he should
recognize as necessary for the protection of the other's person or things."

174.

Columbus Police Department and its Officers undertook to respond to a 911
call for assistance, breached their duty to render appropriate care to Mr. Strum, a
person needing their services to leave the area, and such breach of duty was a
direct cause of the harm that occurred to Mr. Strum.

175.

Columbus Police Department and its agents and employees breached their
duty to Plaintiff by failing to exercise reasonable care in training its employees
with regard to how to respond to and assist persons needing assistance.  The
conduct of the Defendants, as described herein, intentionally and wrongfully
restrained Mr. Strum's freedom of movement and liberty, without consent, and Mr.
Strum suffered distress and was damaged as a result.

176.

As a direct and proximate result of Columbus Police Department's multiple

failures, Mr. Strum suffered physical and emotional injuries, and wrongful death.

## Count XI. - Vicarious / Respondeat Superior Liability

177.

Plaintiff incorporates and realleges all allegations as if set forth fully verbatim

herein.

178.

In Georgia, employers / principals are vicariously liable for damages arising

from the acts or omissions of their employees or agents when such tortious conduct

is committed in the course of the employer's or principal's business, within the scope

of the servant's or agent's employment and is sufficient to authorize a recovery of

punitive damages under OCGA § 51-12-5.1.

179.

OCGA § 51-2-2 provides: "Every person shall be liable for torts committed by

his wife, his child, or his servant by his command or in the prosecution and within

the scope of his business, whether the same are committed by negligence or

voluntarily."

180.

The torts alleged herein were committed in the course and prosecution of the employer / masters' business and within the scope of the servants' / agents' employment and also for purposes of accomplishing the ends of the employment.

## **Count XII. - Punitive Damages**

181.

Plaintiff re-alleges and incorporates by reference each of the allegations and numbered paragraphs set forth above as if fully set forth herein.

182.

Defendants' actions showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against the Defendants in an amount to be determined by the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

183.

Defendants acted with the specific intent to cause harm in that Defendants desired to cause the consequences of their actions and/or knew that the consequences of their actions were substantially certain to result.

184.

Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim to show Defendants recklessly, consciously and deliberately disregarded the risk that their actions posed to Mr. Strum.  As a direct and proximate result of Defendants' conduct, Plaintiff suffered, *inter alia*, substantial pain, suffering, discomfort, lost wages, loss of opportunity and other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for damages and requests the Court:

a. Allow a trial by jury on all issues so triable;

b. Award Plaintiffs compensatory and punitive damages against all Defendants;

c. Grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

d. Award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 10th day of April, 2023

**ERIC J. HERTZ, PC**

*/s/ Eric J. Hertz*
Eric J. Hertz
Georgia Bar Number 349501
*hertz@hertz-law.com*
Jeffrey E. Gewirtz
GA State Bar No. 292434
*jeff@hertz-law.com*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
(404) 577-8111
Fax: (404) 577-8116
*Counsel for Plaintiffs*