IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JANATHAEN STRUM,     \*

  Plaintiff,     \*

vs.        \*   CASE NO. 4:23-CV-61 (CDL)

OFFICER SHANE ABREO,   \*

  Defendant.    \*

_____

O R D E R

  While interviewing a witness about a domestic dispute, Columbus Police Officer Shane Abreo heard shots fired nearby. He responded to the scene of the shooting and encountered the aftermath of a block party with pedestrians and slow-moving cars trying to flee the gunfire. In response to Abreo's inquiries attempting to identify the shooter, bystanders pointed to a BMW driven by Janathaen Strum. Abreo, who was in his police uniform, ordered Strum to get down and get out of the car. Strum ignored his commands and kept driving in the congested traffic. Abreo ran after him shouting for Strum to get out of the car. When Strum failed to stop and continued to flee, Abreo shot him in the back of his shoulder. Strum brought this action against Abreo in his individual capacity pursuant to 42 U.S.C. § 1983, claiming that Abreo violated his Fourth Amendment rights. Abreo seeks summary judgment based on qualified immunity. For the following reasons,

the Court grants Abreo's motion for summary judgment on the § 1983 claim (ECF No. 21). The Court declines to exercise supplemental jurisdiction over Strum's state law claims.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## FACTUAL BACKGROUND

Viewed in the light most favorable to Strum, the record, including a video recording, reveals the following facts. In determining whether there is a genuine fact dispute, the Court

---

[1] Strum initially brought this action against the Columbus Consolidated Government, Lieutenant Jeffrey Bridges, and former Police Chief Freddie Blackmon. Strum abandoned his claims against those Defendants, as well as his official capacity claims against Abreo. Therefore, the only claims remaining are Strum's claims against Abreo in his individual capacity.

must view "the facts in the light depicted by the" recording and may not adopt a version of the facts that is "utterly discredited" by the recording. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it," the Court must take the plaintiff's version of what happened. *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

Janathaen Strum threw a high school graduation party for his brother and sister on May 28, 2022. More than 200 people attended the party. After the party ended at midnight, the partygoers went to Urban Avenue in Columbus, Georgia to continue celebrating at a block party in the early hours of May 29, 2022. Strum drove a black BMW to Urban Avenue and enjoyed the party for a while. But then he heard at least fifteen to twenty shots from handguns and automatic rifles, at which point partygoers—including Strum—started jumping into cars and trying to leave.

When the shooting happened, Columbus Police Officer Shane Abreo was on a nearby street responding to a domestic dispute call about a prior shooting incident. After he heard multiple shots fired, Abreo, who was wearing his standard Columbus Police Department uniform, ran to his marked patrol car, turned on his blue lights, and drove to Urban Avenue. When he turned onto Urban Avenue, Abreo observed cars lined up on both sides of the street. There were people in cars, in yards, and on the street and

sidewalks.[2]  Def.'s Notice of Manual Filing Attach. 5, Abreo Body
Camera Video 1:39:22 to 1:40:54, ECF No. 26 [hereinafter Body Cam
Video].  Abreo noticed that when the partygoers saw his lights,
they started trying to drive away, so he turned off the lights,
exited his vehicle, called for backup, and approached the scene on
foot.  Abreo observed all kinds of spent pistol and rifle shell
casings on the ground, and he saw that multiple cars had been
shot.[3] On the video recording, multiple voices can be heard talking
and yelling.  *Id.*

Abreo asked bystanders where the shooting was coming from,
who shot, and if anyone was hurt.  According to Abreo, a woman
whose car was hit by gunfire pointed toward Strum's black BMW,
which was a couple cars ahead, and more people gestured to the BMW
in response to Abreo's questions about who fired the shots.[4]  Strum
contends that Abreo's testimony is contradicted by the body camera
video footage; Strum accurately describes that footage as not
showing anyone pointing at the BMW.  The question for the Court is

---

[2] Strum argues that Urban Avenue was not "filled or clogged with people."
He is correct that there were not hundreds of people in the street, but
the body camera footage does show more than a few people walking and
running around, plus more than a few moving cars that each had at least
a driver.
[3] Strum asserts that before Abreo arrived on the scene, a woman called
911 and stated that she saw someone in a gray Crown Victoria firing shots
while driving.  Strum did not point to any evidence that a 911 dispatcher
told Abreo about the Crown Victoria.
[4] Abreo relies on his testimony before the Office of Professional
Standards.  Def.'s Mot. Summ. J. Ex. F, Abreo OPS Interview 3, ECF No.
21-7 at 4.  Strum did not object to this evidence, and the only evidence
he cited to dispute it is the body camera video footage.

whether the absence of this pointing toward the BMW on the body camera footage creates a genuine factual dispute as to whether anyone actually pointed toward Strum's vehicle as Abreo claims. A closer examination of the video footage does not contradict Abreo's testimony on this point. It is clear from the video that Abreo spoke with several people, including people he passed as he got closer to the BMW, who were not visible on the body camera footage but who Abreo would have been able to see by turning his head. Abreo's testimony that multiple people pointed or nodded to the BMW is not contradicted by the video, which does not depict everything that was visible to Abreo. Because that video can clearly be reconciled with Abreo's otherwise uncontradicted testimony, no genuine fact dispute exists for purposes of qualified immunity on the issue of whether Abreo reasonably believed that witnesses had identified Strum's BMW as the vehicle from which the shots originated.

Having reasonable cause to believe the shots originated from the BMW, Abreo pursued the BMW as he walked toward it from behind. He passed multiple people and several cars that were in stop-and-go traffic, some heading away from him in the middle of the street and some facing his direction on both sides of the street. One vehicle was directly in front of the BMW, driving the same direction. Another vehicle partially blocked the street ahead, and there were vehicles with people in them driving toward Abreo

and the BMW.  Abreo approached the passenger side of the BMW, yelling "Hey you!  Get down!  Get down!"  Body Cam Video 1:40:38 to 1:40:40.  All of the BMW's windows were down, and the car's interior lights were on.  Abreo saw Strum in the BMW's driver seat.[5]  Strum had his right hand by his side, near the center console; Abreo drew his gun and pointed it and his flashlight at Strum, yelling "Get out the car!"[6]  *Id.* at 1:40:40 to 1:40:43. Strum raised his right hand, then put it down and leaned toward the driver's side door.[7]  *Id.*

Abreo went around the back of the BMW, and Strum started driving away in the congested traffic but was blocked by cars in front and on both sides.  Abreo ran behind the BMW and caught up to it, yelling "Get out the car!"  When Abreo reached the driver's side door, Strum briefly put his left hand up and out of the

---

[5] Abreo contends that he recognized Strum's face from a Columbus Police Department "be on the lookout" bulletin, which indicated that Strum was a known gang member and there was a warrant out on Strum for aggravated assault.  Strum does not dispute that there was a BOLO for him, but he contends that Abreo did not associate him with the BOLO because he never used Strum's name or mentioned the BOLO on the scene.

[6] Abreo believes that he saw Strum trying to pull a gun from the center console near his right hip; after the shooting, he told Strum and other officers multiple times that he shot Strum because he saw a gun and because Strum was driving away.  No gun is visible on the video, and no gun was found during a later search of the BMW and Strum.  Strum contends that Abreo "made up the presence of a gun based on a video recording of Mr. Strum holding a gun," which Abreo's colleague found on the internet. Pl.'s Statement of Material Facts ¶ 26, ECF No. 27-2.  The evidence Strum cited is simply the testimony of Abreo's colleague that she found a video of Strum while performing a routine "suspectology and/or victimology." McKelvey Dep. 6:11-7:3, ECF No. 30.  Nothing in the cited testimony establishes that the video inspired Abreo to lie about a gun.

[7] Strum asserts that he could not see that Abreo had on a police uniform, and he contends that he believed he was being carjacked.

window, then he drove away from Abreo.[8]  Abreo fired a single shot
toward Strum, hitting Strum in the left shoulder; the shooting was
approximately fourteen seconds after Strum approached the
passenger side of the BMW.  At the time of the shooting, there was
no car directly in front of the BMW, there was one car to the BMW's
right (faced toward the BMW), several cars were slowly driving
toward the BMW on the left, and other cars were driving away ahead
of the BMW on the right.  *Id.* at 1:40:49-1:40:52.  As Strum points
out, Abreo chose that precise moment to shoot because there was no
vehicle or pedestrian directly in front of the BMW, and he aimed
for Strum's left shoulder because that line of fire showed no one
directly in front of Strum.

Strum crashed the BMW into another vehicle, jumped out of the
BMW, and started running away but soon got down on the ground with
his hands up.[9]  Strum asked why Abreo shot him, and Abreo responded
that it was because he saw Strum with a gun and because Strum would
not stop the car.  Bystanders approached and surrounded Strum and
Abreo, and one of them used a shirt to apply pressure to Strum's
wound.  At the time, Abreo was the only officer on the scene.
Abreo called for an ambulance and handcuffed Strum.  Strum was

---

[8] Abreo claims that Strum ran over his foot, but the body camera video
does not show Strum running over Abreo's foot.  When another officer
asked Abreo what happened shortly after the shooting, Abreo responded
that Strum *almost* hit him.  Body Cam Video 1:58:48-1:59:12.
[9] The occupant of the vehicle Strum crashed into was not injured, but he
stayed on the scene because he wanted his car fixed.  Jones Dep. 11:10-
17, ECF No. 25.

transported to the hospital, where he was treated for the gunshot wound.

DISCUSSION

Abreo seeks qualified immunity on Strum's § 1983 claims against him. "Qualified immunity protects a government official from being sued for damages under § 1983 unless preexisting law clearly establishes the unlawfulness of his actions, such that any reasonable official in his position would be on notice that his conduct was unlawful." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019). To receive qualified immunity, "an official must first establish that he was acting within his discretionary authority when he engaged in the allegedly unlawful conduct." *Id.* There is no dispute that Abreo was performing discretionary functions when he shot Strum. Thus, Strum must show that Abreo violated his constitutional rights and that those rights were clearly established at the time of the pursuit and shooting. *Id.* "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (alteration in original) (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)).

"A plaintiff can show that his constitutional rights were clearly established in any one of three ways." *Id.* "First, he can point to a materially similar case decided by the Supreme

Court, [the Eleventh Circuit], or the highest court of the relevant state that clearly establishes the unlawfulness of the police conduct." *Id.* "Second, even in the absence of such precedent, a plaintiff can point to a 'broader, clearly established principle [that] should control the novel facts in [his] situation,' provided that the principle gives the officer 'reasonable warning that the conduct at issue violated constitutional rights.'" *Id.* (alterations in original) (citation omitted) (first quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013); then quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). "Third, a plaintiff can show that the conduct at issue 'lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Id.* (alteration in original) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)). Here, Strum focuses on caselaw that he asserts is controlling; he does not argue that this is a "clearly established principle/novel facts" case or an "obvious clarity" case.

The Fourth Amendment prohibits excessive force during a seizure; any force used must be reasonable under the circumstances. "Reasonableness is a fact-specific inquiry that turns on such factors as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight.'"  *Id.* at 1279 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Deadly force is only reasonable under the Fourth Amendment "when an officer (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible."  *Id.* (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005)). Although the Court "must construe the facts in the light most favorable to" Strum, "reasonableness is determined from the perspective of the officer, and not with the '20/20 vision of hindsight.'"  *Id.* (quoting *Graham*, 490 U.S. at 396).

Strum correctly asserts that it is clearly established that a "police officer may not seize an unarmed, nondangerous suspect by" using deadly force.  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  In *Garner*, for example, the officer's use of deadly force was unconstitutional because the suspect, who was fleeing from the burglary of an unoccupied house, was "young, slight, and unarmed," and the officer "could not reasonably have believed that" he "posed any threat."  *Id.* at 21.  Likewise, an officer clearly may not use "deadly force against a non-resisting suspect who posed no danger." *Perez v. Suszczynski*, 809 F.3d 1213, 1217, 1222 (11th Cir. 2016)

(finding that the plaintiff's version of the facts supported a clearly established Fourth Amendment violation: the officer shot the suspect execution style in the back after the suspect was disarmed and complied with orders to get on his stomach on the ground with his hands behind his back); *see also Morton*, 707 F.3d at 1279-81, 1284-85 (finding that an officer was not entitled to qualified immunity when the plaintiff's evidence established that (1) the plaintiff was parked in a parking lot with his engine running, (2) the plaintiff slowly coasted away when he saw a police truck enter the parking lot, (3) when the plaintiff noticed a police officer chasing him he shifted his car into park and raised his hands, and (4) the officer had no probable cause to believe that the plaintiff committed any crime or that the plaintiff was a threat to anyone); *cf. Hunter*, 941 F.3d at 1280 (concluding that under the plaintiff's version of the facts, the officer violated the plaintiff's clearly established Fourth Amendment rights because he fired seven shots at a man who was unarmed because he dropped his gun); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) (finding, under the plaintiff's facts, that when the officer shot a fleeing truck, "he simply faced two suspects who were evading arrest and who had accelerated to eighty to eighty-five

miles per hour in a seventy-miles-per-hour zone in an attempt to avoid capture").[10]

Strum argues that under his version of what happened, which he contends is supported by the record giving him the benefit of all reasonable inferences, he was clearly a nondangerous person trying to flee the scene of a mass shooting in which he did not participate. Strum is correct that the evidence viewed in the light most favorable to him would likely permit a jury to conclude that he had no gun in the BMW when Abreo shot him and did not run over Abreo's foot. But these factual disputes do not negate Abreo's reasonable belief that Strum had fired shots during the mass shooting incident that occurred moments before Abreo arrived on the scene. Abreo heard the shots, and he saw evidence of the shooting in the form of bullet holes in multiple cars and shell casings that littered the street. When Abreo asked bystanders who fired the shots, they gestured toward Strum's BMW. As previously noted, the body camera footage does not contradict this testimony by Abreo. While the video may not conclusively *corroborate* Abreo's testimony, it does not *contradict* it because the video does not

---

[10] Strum relies heavily on *Edwards v. Oliver*, a Fifth Circuit case, to argue that Abreo's use of deadly force violated clearly established law under the circumstances he faced. *See* 31 F.4th 925 (5th Cir. 2022). *Edwards* could not have put Abreo on notice of a clearly established right because only binding decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the Georgia Supreme Court can clearly establish the law for Abreo. *See Hunter*, 941 F.3d at 1278.

capture everything that Abreo observed.  Without some evidence to contradict Abreo's testimony, it would be speculation to accept Strum's argument that the bystanders did not gesture toward Strum's BMW.  The Court is not required to accept a plaintiff's speculation regarding what happened.  Instead, the Court must accept the version of the facts that is most favorable to the plaintiff. Here, those facts establish that Abreo reasonably believed that the person who fired the shots was fleeing the scene in the BMW and that a substantial risk existed that other persons could be injured.  *Cf. Harris v. Hixon*, No. 22-12493, 2024 WL 2235954, at *4 (11th Cir. May 17, 2024) (noting, in the context of a mistaken identity case where the officer believed that a man was the suspect he was looking for, that the "touchstone of reasonableness under the Fourth Amendment" is "sufficient probability, not certainty" (quoting *Hill v. California*, 401 U.S. 797, 804 (1971)).

The key question is whether Abreo's use of deadly force under these circumstances violated clearly established law.[11]  Strum did

---

[11] The Court understands that Strum's use of force expert opines that the force here was unreasonable.  His analysis hinges on (1) the assumption that Abreo did not reasonably suspect Strum of participating in the mass shooting and (2) his frame-by-frame analysis of the body camera footage to determine that the BMW was not an imminent threat to Abreo or the people in the surrounding vehicles.  Again, though, Abreo did reasonably suspect Strum of participating in the mass shooting.  And while a frame-by-frame review of the body camera footage suggests that there was no vehicle directly in front of the BMW at the precise millisecond when Abreo fired his gun, Abreo reasonably perceived that there were other vehicles on the road in the vicinity of the BMW as Strum tried to flee the scene.

not identify any case demonstrating a clearly established rule prohibiting a police officer from using deadly force in circumstances like those here, where the officer reasonably believed that the fleeing suspect had just participated in a mass shooting incident and was trying to maneuver his vehicle around other cars in congested traffic seconds before the officer fired. Rather, in all of Strum's cases, there was evidence to suggest that the suspects did not pose a threat to the officer or others.

Binding precedent establishes that deadly force does not violate the Fourth Amendment when a reasonable officer would believe that the suspect is gravely dangerous. *See, e.g.*, *Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) (finding no violation of clearly established rights when an officer shot a suspect who threatened others with what officers reasonably believed was a real firearm and refused to comply with officers' commands to drop the weapon—though the weapon turned out to be a realistic looking toy gun). Binding precedent also establishes that if an officer reasonably believes that a suspect driving a vehicle poses imminent danger to the officer or to others under the circumstances, the officer does not violate the Fourth Amendment by using deadly force; "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (finding no violation

14

of clearly established law where officer shot a mentally unstable suspect who had stolen a police cruiser but had not yet used it as a weapon); *see Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1299 (11th Cir. 2021) (finding no violation of clearly established law where an officer who was on foot shot at a suspect's moving vehicle because he reasonably perceived that his life was in danger); *Pace v. Capobianco*, 283 F.3d 1275, 1282–83 (11th Cir. 2002) (finding no violation of clearly established law where officers shot a suspect who had stopped his vehicle after a high-speed chase—even though the court accepted that, at the time of the shooting, the suspect had neither tried to run over nor aimed the vehicle at officers).

So, while it was clearly established that Abreo would not have been permitted to use deadly force if the facts established that Strum was a nondangerous suspect, that is not the situation Abreo faced, even when the evidence is viewed in the light most favorable to Strum. Rather, as discussed above, Abreo reasonably believed that Strum had just participated in a mass shooting incident and was fleeing the scene while ignoring Abreo's commands to stop and while trying to maneuver his car dangerously through congested traffic just before Abreo fired. The Court concludes that preexisting law did not provide fair warning that shooting Strum under such circumstances would violate federal law, and Abreo is thus entitled to qualified immunity.

CONCLUSION

For the reasons set forth above, the present record establishes as a matter of law that Abreo is entitled to qualified immunity on Strum's § 1983 claim against him. Accordingly, the Court grants Abreo's summary judgment motion on that claim. Because Strum abandoned his § 1983 claims against the other Defendants, no federal claims remain pending in this case. The Court declines to exercise supplemental jurisdiction over Strum's state law claims, *see* 28 U.S.C. § 1367(c)(3), and those claims are dismissed without prejudice.

IT IS SO ORDERED, this 23rd day of May, 2024.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA